No. 61,678

STATE OF KANSAS, *Appellee,* v. GARY WADE, *Appellant.*

(766 P.2d 811)

Opinion filed January 3, 1989.

*Karen E. Mayberry*, assistant appellate defender, argued the cause, and *Benjamin C. Wood*, chief appellate defender, was with her on the briefs for appellant.

*Sue Carpenter*, assistant district attorney, argued the cause, and *Susan Stanley*, assistant district attorney, *Gene M. Olander*, district attorney, and *Robert T. Stephan*, attorney general, were on the brief for appellee.

The opinion of the court was delivered by

Six, J.: Gary Wade was convicted of aggravated criminal sodomy, K.S.A. 1987 Supp. 21-3506.

The first issue in his appeal is whether the trial court had jurisdiction. Was the criminal complaint, used as an information, defective because it failed to allege that the five-year-old child victim, S.E., was not married to the offender?

The trial court did have jurisdiction. The information was not defective.

A secondary issue focuses on the trial court's admission, over Wade's objection, of the testimony of a social rehabilitation service worker who had observed and interviewed S.E., the five-year-old child victim. The trial court did not abuse its discretion in admitting the SRS worker's testimony.

Wade also contends there was not sufficient evidence for a rational factfinder to find him guilty beyond a reasonable doubt; consequently, he reasons his motion to dismiss should have been granted. We disagree.

Finding no error, we affirm.

In January of 1986, S.E.'s parents, D.E. and R.E., separated. S.E. and her mother moved into an apartment in Auburn, Kansas. In February, Gary Wade, the defendant, moved into the apartment. In March, S.E. told her mother of Wade's actions that formed the aggravated criminal sodomy charge. We choose not to recite the indelicate factual background. The rationale for our decision does not rest upon the physical fact relationship between S.E. and Wade.

S.E.'s mother testified that, when Wade found out about the accusation, he beat her up, causing two black eyes and a bloody nose. He then grabbed her as well as S.E. by the neck and threatened to kill them if they told anyone. Wade testified that when he found out about the accusations, he was "disap-

pointed." He told the mother and S.E. that the accusation should not be discussed outside the family. According to Wade, S.E. began to throw a temper tantrum. He spanked her and put her to bed. After S.E. was in bed, he and S.E.'s mother had a discussion during which things were thrown and verbal abuse was exchanged. Wade denied that he beat the mother.

S.E.'s mother testified that, after Wade threatened them, S.E. told her that she had made the story up to try to break up her mother's relationship with Wade. There was testimony that S.E. wanted her parents to get back together and that she did not like living with Wade. There also was testimony that the mother had previously talked to S.E. about what S.E. should do if anyone ever made any sexual advances to her and that people that did those things are sent to jail. S.E. told a social worker that she wanted Wade put in jail. S.E.'s mother also testified that S.E. had once walked in on Wade and the mother while they were having oral sex. She said, however, that she thought S.E. had not seen anything.

S.E. told her mother that S.E.'s incident with Wade occurred in the bathroom. S.E. told the social worker that the incident occurred in the living room.

In June 1986, SRS removed S.E. from her mother's custody. The removal was not based on the alleged sexual abuse by Wade, as this had not yet been reported to the authorities. The reason for the removal appears to have been excluded prior to trial by a defense motion in limine. S.E. was first placed in foster care. Later in July, custody was given to her paternal grandmother (with whom her father lived). Her father testified that, late in July, S.E. told him about the alleged incident of sexual abuse. The incident was reported to Michelle Mlynar, a child protection worker, in July 1986. Mlynar interviewed S.E. in August 1986 and again in October.

In August, S.E.'s parents reported the sexual abuse incident to the Shawnee County Sheriff's Department. The testimony indicated that shortly after the incident was reported to the police, S.E.'s mother moved back in with Wade. She had also reported that Wade had beaten her up, but later refused to testify against him. S.E.'s mother continued to live with Wade until he was arrested on the aggravated criminal sodomy charge. She visited him in jail a couple of times after the arrest.

S.E.'s mother was told by SRS that she could not regain custody of S.E. unless she disassociated herself from Wade. At one point, the mother accused Michelle Mlynar of postponing a custody hearing to make sure that she would testify against Wade in the sodomy case. The mother regained custody of S.E. in February 1987, with the understanding that S.E. was to have no contact with Wade.

The jury found Wade guilty of aggravated criminal sodomy in April 1987. Wade was sentenced to 45 years to life in June 1987. Wade moved for modification of sentence. The sentence was modified to 15 to 60 years on October 7, 1987, and Wade filed his notice of appeal on the same day.

## 1. JURISDICTION

Wade was charged under K.S.A. 1987 Supp. 21-3506, which provides:

"Aggravated criminal sodomy is:

"(a) Sodomy with a child who is not married to the offender and who is under 16 years of age."

The information upon which Wade was convicted read as follows:

"I, Gene M. Olander, being duly sworn, on oath, says that on or about the _____ day of March to April A.D. 1986 in the County of Shawnee and State of Kansas, Gary G. Wade Route 2, Box 34A, Carbondale, Kansas, dob 1-31-61, WM, 5'9" 135#, bro/bro did then and there unlawfully, feloniously, and willfully, . . . engage in oral copulation with [S.E.] a child under the age of sixteen, to-wit, age 5, contrary to the form of the statutes in such case made and provided and against the peace and dignity of the State of Kansas."

The information fails to allege that S.E., the child victim, is not married to the offender. Wade contends that such an allegation is one of the essential elements of the crime of aggravated criminal sodomy set out in K.S.A. 1987 Supp. 21-3506. We agree. He asserts that failure of the information to state the essential element of non-marriage is a fundamental defect and, consequently, his conviction is void. We disagree.

The essential element of non-marriage is implied by a common-sense construction when the information, on its face, recites the tender age of the victim; here, five years. The trial court did have jurisdiction.

Wade relies on State v. Jackson, 239 Kan. 463, 721 P.2d 232 (1986). In Jackson, the defendant appealed his conviction of two counts of indecent liberties with a child and one count of ag-

gravated criminal sodomy. The alleged victim in *Jackson* was six years old. We reversed both counts of indecent liberties with a child because essential elements of the offense were omitted from the information. The first count failed to allege that the victim was under sixteen years of age. The second count failed to allege that the child was not married to the accused and that the child was under sixteen years of age. 239 Kan. at 465. We distinguish *Jackson* on the basis that neither count alleged the child's age. Therefore, there was nothing on the face of the information that would indicate that the victim could not be married to the offender and, in addition, the information also failed to state another essential element. The aggravated criminal sodomy charge was reversed on other grounds. 239 Kan. at 470.

In its brief, the State conceded that the court lacked jurisdiction of Wade because of the defect in the information. At oral argument, however, the State shifted its position. Counsel for the State suggested that failure to allege that S.E. was not married to the defendant is not a fatal defect because it is a legal impossibility for a five-year-old to be married. No authority was cited. Wade's counsel was granted permission to file a supplemental brief. Wade observes that, although the probability of a five-year-old being married is low, such a marriage is possible.

A kindergarten wedding would be a ceremony of the absurd. It is a legal impossibility for a five-year-old to be married in Kansas.

There is no minimum statutory age for marriage in Kansas. The K.S.A. 23-106 age limitation relates only to the issuance of a marriage license without parental (or guardian) and judicial consent. Anyone under the age of 18 must have the consent of a parent or legal guardian and a judge of the district court to be issued a marriage license.

K.S.A. 23-101 provides:

*"The marriage contract is to be considered in law as a civil contract between two parties who are of opposite sex, to which the consent of the parties is essential;* and the marriage ceremony may be regarded either as a civil ceremony or as a religious sacrament, but the marriage relation shall only be entered into, maintained or abrogated as provided by law." (Emphasis added.)

The validity of a contract of marriage entered into by a minor was considered in *Browning v. Browning*, 89 Kan. 98, 130 Pac. 852 (1913). The court discussed the requirements for the issuance of a marriage license and the validity of a marriage

entered into by a minor without the necessary statutory consents which were similar to those in K.S.A. 23-106. The court stated:

"The act already referred to, in the case of a groom under seventeen years of age, or of a bride under fifteen, requires the consent of the probate judge, as well as the parent or guardian, but *we have no statute fixing the age at which persons are capable of entering into the marriage relation. The common law, therefore, governs, the ages being fourteen and twelve respectively.*" 89 Kan at 100. (Emphasis added.)

See *State v. Johnson*, 216 Kan. 445, 448, 532 P.2d 1325 (1975).

The information stated S.E.'s age as five. She could not have been married to Wade. The information: (1) should be read in its entirety; (2) construed according to common sense, and (3) interpreted to include facts which are necessarily implied. *State v. Micheaux*, 242 Kan. 192, 199, 747 P.2d 784 (1987). There is no jurisdictional defect.

K.S.A. 1987 Supp. 22-3201(2) provides, in part:

"(2) The complaint, information or indictment shall be a plain and concise written statement of the essential facts constituting the crime charged, which complaint, information or indictment, drawn in the language of the statute, shall be deemed sufficient."

While the statute makes it clear that an offense stated in the language of the statute is sufficient, there is no requirement that it must be stated in the statutory language. In *State v. Lashley*, 233 Kan. 620, 628, 664 P.2d 1358 (1983), the court stated:

"K.S.A. 22-3201 requires that the information be a plain and concise written statement of the essential facts constituting the crime charged. The information must enable the accused to know the nature and the cause of the charge to form a defense."

In *State v. Loudermilk*, 221 Kan. 157, 159, 557 P.2d 1229 (1976), we stated:

"The federal courts have held that under the language of the Sixth Amendment and under the due process clause of the Fourteenth Amendment, an indictment or information must be drawn with sufficient clearness and completeness to show a violation of law, to enable the accused to know the nature and cause of the charge against him and to enable him to make out his defense."

In the present case the information clearly and concisely advised Wade of the charges he was facing and sufficiently advised him so that he could defend against them. Wade knew he was not married to the five-year-old victim and the failure to allege that fact did not mislead him or impair his ability to present his defense. The allegation that the victim was only five years old

carries with it the implicit and obvious fact that the victim was not and could not have been married to the defendant. *Cf. State v. Bishop*, 240 Kan. 647, 732 P.2d 765 (1987) (alleging assault committed with a deadly weapon, a 12 guage shotgun, sufficient to allege apparent ability).

The jury was instructed as to the elements of aggravated sodomy. Instruction Number 2 included the following:

"The defendant is charged in the complaint with the crime of aggravated sodomy. The defendant pleads not guilty.

"To establish this charge, each of the following claims must be proved:
. . . .
"2) That [S.E.] was a child who was not married to the defendant and who was under sixteen years of age."

The record reflects the mother testified on direct examination:

"Q. And how old is [S.E.]?
"A. She'll be six in May.
"Q. Is your daughter married to anyone, ma'me?
"A. No, she's not."

In *State v. Howell & Taylor*, 226 Kan. 511, Syl. ¶ 2, 601 P.2d 1141 (1979), we stated:

"If the facts alleged in an information do not constitute an offense within the terms and meaning of the statute upon which it is based, the information is fatally defective. The evidence introduced at trial to show commission of the crime sought to have been charged and the jury instruction thereon have no bearing on this question."

*Howell & Taylor* does not control the instant case. Here the information stated S.E. was five years of age. S.E.'s marriage to the offender was a legal impossibility. All of the essential elements of the crime were contained in the information.

## 2. THE SOCIAL REHABILITATION SERVICE WORKER'S TESTIMONY

Michelle Mlynar is a child protection worker who was assigned to investigate S.E.'s case. Mlynar has a Bachelor of Science in Social Work and is licensed by the State of Kansas. At the time of Wade's trial, Mlynar had been a social worker, working on child protective cases, for two and one-half years. During that time, she had investigated over 75 cases, 18 of which involved sexual abuse. She has also attended numerous sexual abuse workshops provided by the State.

Mlynar testified for the State. She testified as to what S.E. told

her and about the use of anatomically correct dolls in her interviews with S.E. She also testified that she and S.E. had a good relationship and that S.E. sees her as a protector. Wade, during redirect examination by the State, objected to the following testimony.

"Q. [Counsel for the State] You testified, ma'me, that at some point, in response to questions from counsel [for Wade], at some point after you've talked with the child, you have to make what you call a 'case determination.'
"A. [Mlynar] Yes.
"Q. What things do you look for in order to make the determination you're responsible for?
"A. I look for consistency. When I interview a child, I cannot lead the child and ask them to tell me what happened. They have to tell me what happened on their own accord in a sexual-abuse investigation; so, I do not put words in children's mouths, and when a child tells me that they have been sexually abused, most of the time they're very angry, they're very fearful, and very afraid, and most children, who have been sexually abused, also go through a time where they have a lot of behavior difficulties, and I saw every one of those with [S.E.]."

Wade stated two grounds for his objection: (1) Mlynar was not qualified as an expert; and (2) testimony corroborating the testimony of the victim is impermissible under *State v. Bressman*, 236 Kan. 296, 689 P.2d 901 (1984), because it takes the determination of the child's credibility out of the hands of the jury. The court overruled the objection, stating:

"I didn't think she was testifying as an expert. . . . She was relating to the jury the steps she took, the different observations she has made of the eighteen, but she's not relating that as the scientific community criteria for determination as to expressing an opinion."

Mlynar was not asked any further questions about her methodology or her observations of S.E. She was never asked her opinion as to the veracity of S.E.'s story.

*Bressman* was a rape case in which the doctor who treated the victim was called to testify. The doctor worked in an emergency room which was a rape referral center and had examined many individuals who claimed they had been raped. 236 Kan. at 301. The doctor testified as to the common characteristics and emotional problems that she had seen in the rape victims she examined. Although the physical tests the doctor performed were all negative and there was no evidence of physical trauma, the doctor testified that she believed the victim had been raped. 236 Kan. at 302. We found that the trial judge erred in admitting the testimony. There was no showing that the doctor was trained in

psychiatry. There was a lack of foundation to qualify the doctor as an expert able to render such an opinion. 236 Kan. at 303. In *Bressman,* we said:

"Here the normal experiences of laymen jurors would permit them to draw proper conclusions from the evidence presented by the State. In addition, Dr. Stass-Isern, [the emergency room doctor,] in arriving at her opinion that Mrs. T had been raped, of necessity had to pass upon the credibility of Mrs. T's story." 236 Kan. at 303-04.

The facts of the case at bar are similar to the facts in *State v. Clements,* 241 Kan. 77, 734 P.2d 1096 (1987). In *Clements,* the defendant was accused of sodomizing an eleven-year-old boy. At the trial, a mental health therapist who had counseled the victim after the incident testified. As with Mlynar's testimony in the instant case, the therapist in *Clements* testified as to what the victim had told him and whether the victim's progress in counseling was consistent with the victim's story. The therapist never testified as to his opinion of whether the victim was telling the truth.

"Mr. Pletcher's testimony relative to his patient's initial condition and progress during treatment may tend to corroborate parts of P.V.'s testimony inferentially, but Pletcher's testimony is not an impermissible opinion on whether or not P.V. is testifying truthfully as to the facts giving rise to sodomy charges." 241 Kan. at 80.

Lay opinion testimony is permitted by K.S.A. 60-456 in some circumstances:

"(a) If the witness is not testifying as an expert his or her testimony in the form of opinions or inferences is limited to such opinions or inferences as the judge finds (a) may be rationally based on the perception of the witness and (b) are helpful to a clearer understanding of his or her testimony.

. . . .

"(c) Unless the judge excludes the testimony he or she shall be deemed to have made the finding requisite to its admission."

A review of the transcript of Mlynar's cross-examination indicates that defense counsel questioned her about her case investigation of S.E. and about her "judgment call" of sexual abuse.

"Q. [Wade's Counsel] So, and in investigating a case like that, one, basically, has to take an attitude, either you believe the child or you don't believe the child. Would that be a fair statement?
"A. Not before the interview, no.
"Q. Okay. After the interview takes place and you have information, then you're going to have to make a judgment call pretty much whether you believe the act occurred, or the act didn't occur.
"A. Yes, right.

"Q. Then, your job, basically, is to turn it over to the office to investigate the case.
"A. Yeah; after I conduct a sexual abuse interview, I make a case determination on whether I believe that it's unconfirmed or confirmed."

Mlynar's case determination judgment call was opened up by the defense.

A witness may be asked questions on redirect examination to clarify or modify statements made on cross-examination. A witness on redirect may also explain the effect of new matters brought out on cross-examination. *State v. Martin*, 241 Kan. 732, 739, 740 P.2d 577 (1987).

The admission of non-expert opinion testimony is within the trial court's discretion. *State v. Craig*, 215 Kan. 381, 383, 524 P.2d 679 (1974). Mlynar, on redirect examination, described what she looked for when required to make a sexual abuse case determination judgment call as an SRS case worker. She described the behavior of children who have told her they have been sexually abused and stated that it was consistent with the behavior she observed in S.E. She also stated that most children who have been sexually abused also go through a time where they have a lot of behavior difficulties. She did not testify as to whether she believed S.E.'s story. She expressed no opinion as to the credibility of the victim's story. Defense counsel was free to cross-examine Mlynar as to what other causes there might be for S.E.'s behavior.

The trial court did not abuse its discretion.

We signal prosecutors to stand with caution as they embark on the direct examination of child protection workers in sexual offense cases. Care is to be exercised to observe the distinctions between *Clements* and *Bressman* and to avoid the inquiry prohibited by *Bressman*.

## 3. THE SUFFICIENCY OF THE EVIDENCE

Wade argues that the evidence was insufficient to sustain his conviction.

When a defendant in a criminal action challenges the sufficiency of the evidence to support a conviction, our scope of review is limited. Does the evidence viewed in that light most favorable to the prosecution convince us that a rational factfinder could have found the defendant guilty beyond a reasonable doubt? *State v. Willis*, 240 Kan. 580, 587, 731 P.2d 287 (1987).

Although there was some evidence presented which tended to

challenge the credibility of S.E., under the *Willis* standard, we need not review it. The jury believed the testimony of S.E. and of the witness who corroborated her testimony. The credibility of witnesses is a determination for the finder of fact, in this case the jury. Witness credibility should not be second-guessed by an appellate court, which only has access to the cold transcript of the trial proceedings. The trial court did not err in denying Wade's motion to dismiss.

Affirmed.